UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

ALLEN D. DANIEL,

              Plaintiff,                  Case No. 2:21-cv-38

v.                                    Honorable Robert J. Jonker

CONNIE HORTON et al.,

              Defendants.
_____/

## OPINION DENYING LEAVE
## TO PROCEED *IN FORMA PAUPERIS* - THREE STRIKES

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff seeks leave to proceed *in forma pauperis*. Because Plaintiff has filed at least three lawsuits that were dismissed as frivolous, malicious or for failure to state a claim, he is barred from proceeding *in forma pauperis* under 28 U.S.C. § 1915(g). The Court will order Plaintiff to pay the $402.00 civil action filing fees applicable to those not permitted to proceed *in forma pauperis*.[1] This fee must be paid within twenty-eight (28) days of this opinion and accompanying order. If Plaintiff fails to pay the fee, the Court will order that this case be dismissed without prejudice. Even if the case is dismissed, Plaintiff must pay the $402.00 filing fees in accordance with *In re Alea*, 286 F.3d 378, 380–81 (6th Cir. 2002).

---

[1] The filing fee for a civil action is $350.00. 28 U.S.C. § 1914(a). The Clerk is also directed to collect a miscellaneous administrative fee of $52.00. 28 U.S.C. § 1914(b); https://www.uscourts.gov/services-forms/fees/district-court-miscellaneous-fee-schedule. The miscellaneous administrative fee, however, "does not apply to applications for a writ of habeas corpus or to persons granted *in forma pauperis* status under 28 U.S.C. § 1915." *Id.*

### Discussion

The Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which was enacted on April 26, 1996, amended the procedural rules governing a prisoner's request for the privilege of proceeding *in forma pauperis*.  As the Sixth Circuit has stated, the PLRA was "aimed at the skyrocketing numbers of claims filed by prisoners–many of which are meritless–and the corresponding burden those filings have placed on the federal courts." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997).  For that reason, Congress created economic incentives to prompt a prisoner to "stop and think" before filing a complaint.  *Id.*  For example, a prisoner is liable for the civil action filing fee, and if the prisoner qualifies to proceed *in forma pauperis*, the prisoner may pay the fee through partial payments as outlined in 28 U.S.C. § 1915(b). The constitutionality of the fee requirements of the PLRA has been upheld by the Sixth Circuit. *Id.* at 1288.

In addition, another provision reinforces the "stop and think" aspect of the PLRA by preventing a prisoner from proceeding *in forma pauperis* when the prisoner repeatedly files meritless lawsuits.  Known as the "three-strikes" rule, the provision states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under [the section governing proceedings *in forma pauperis*] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  The statutory restriction "[i]n no event," found in § 1915(g), is express and unequivocal.  The statute does allow an exception for a prisoner who is "under imminent danger of serious physical injury."  The Sixth Circuit has upheld the constitutionality of the three-strikes rule against arguments that it violates equal protection, the right of access to the courts, and due

2

process, and that it constitutes a bill of attainder and is *ex post facto* legislation.  *Wilson v. Yaklich*, 148 F.3d 596, 604–06 (6th Cir. 1998).

Plaintiff has been an active litigant in the federal courts in Michigan.  At least five of Plaintiff's lawsuits have been dismissed as frivolous or for failure to state a claim.  *See, e.g.*, *Daniel v. Paionte et al.*, No. 2:08-cv-13999 (E.D. Mich. Oct. 7, 2008); *Daniel v. Hofbauer et al.*, No. 2:08-cv-118 (W.D. Mich. Sept. 26, 2008); *Daniel v. Hackel et al.*, 2:08-cv-14000 (E.D. Mich. Sept. 25, 2008); *Daniel v. Granholm*, No. 2:08-cv-10999 (E.D. Mich. Apr. 11, 2008); *Daniel v. Caruso et al.*, No. 2:08-cv-11000 (E.D. Mich. Apr. 10, 2008).  In addition, Plaintiff has been denied leave to proceed *in forma pauperis* under the three-strikes rule in more than a dozen cases.

Moreover, Plaintiff's allegations do not fall within the "imminent danger" exception to the three-strikes rule. 28 U.S.C. § 1915(g).  In his tedious and scarcely legible, 114-page complaint,[2] Plaintiff raises a litany of allegations concerning the actions and inactions of 35 Defendant prison officials between March 10, 2020, and February 26, 2021.  All of the conduct to which Plaintiff objects occurred at the Chippewa Correctional Facility (URF), though Plaintiff was transferred to the Central Michigan Correctional Facility (STF) shortly after he filed his complaint.  A significant number of Plaintiff's allegations concern specific incidences of individual Defendants' alleged violations of COVID-19 protocols or negligence in supervising the enforcement of protocols over the course of a year and allegations of inadequate protocols: specific complaints about occasions on which individual officers removed their masks; general and recurring complaints about officers not changing their clothing after working in a unit with COVID-19-positive inmates before coming to Plaintiff's unit ("cross-contamination"); and

---

[2] Plaintiff has written his complaint with a black marker, which has obscured his slanted script.  Even employing magnification, the Court has experienced difficulty deciphering some words, despite the investment of significant time and effort.

3

general complaints about the lack of adequate social distancing in the unit, the showers, and the mess hall.  However, many other allegations are wholly unrelated to the management of COVID-19, including the following occurrences:  the breaking of Plaintiff's glasses; the filing of multiple false misconduct charges; the improper resolution of misconduct tickets; many episodes of retaliation for the exercise of First Amendment rights; ongoing verbal harassment; unreasonable searches; interference with or denial of grievances; mishandling of property; mishandling of mail; reading of legal mail; denial of library privileges; denial of due process in hearings; causing an injury to his knee and failing adequately to treat it; denial of dental care and injury from dental care; failure to protect him from second-hand smoke on certain occasions; and failure to supervise subordinates.  Plaintiff sweepingly and repeatedly alleges that each of these incidents has placed him in imminent danger of serious physical injury over the course of the year.[3]

---

[3] The Court notes that many of Plaintiff's claims against most of the named Defendants are not properly joined in this single action.  Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims.  Rule 20(a)(2) governs when multiple defendants may be joined in one action: "[p]ersons . . . may be joined in one action as defendants if:  (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Rule 18(a) states:  "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."

Under these rules, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact."  *Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009) (internal quotation omitted); *see also* 7 Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure Civil* § 1655 (3d ed. 2001), *quoted in Proctor*, 661 F. Supp. 2d at 778, *and Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (joinder of defendants is permitted by Rule 20 if both commonality and same transaction requirements are satisfied).  When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "'the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations.'"  *Proctor*, 661 F. Supp. 2d at 778 (quoting *Nali v. Mich. Dep't of Corr.*, No. 07-10831, 2007 WL 4465247, at *3 (E.D. Mich. Dec. 18, 2007)).

Here, Plaintiff simply lumps into a single action every grievance he has amassed against every possible Defendant over the space of one year.  Although the Court need not decide which of Plaintiff's multitudinous claims should be dismissed for misjoinder, it is beyond dispute that Plaintiff utilized a catch-all complaint in order to avoid the three-strikes rule.  Numerous courts have recognized that prisoners frequently attempt to avoid the three-strikes rule by improperly joining claims and defendants, and those courts have disallowed such misjoinder.  *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (recognizing that prisoners combine misjoined claims in a single action to dodge the three-strikes rule); *Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert

The Sixth Circuit set forth the following general requirements for a claim of imminent danger:

> In order to allege sufficiently imminent danger, we have held that "the threat or prison condition must be real and proximate and the danger of serious physical injury must exist at the time the complaint is filed." *Rittner v. Kinder*, 290 F. App'x 796, 797 (6th Cir. 2008) (internal quotation marks omitted). "Thus a prisoner's assertion that he or she faced danger in the past is insufficient to invoke the exception." *Id.* at 797–98; *see also* [*Taylor v. First Med. Mgmt.*, 508 F. App'x 488, 492 (6th Cir. 2012)] ("Allegations of past dangers are insufficient to invoke the exception."); *Percival v. Gerth*, 443 F. App'x 944, 946 (6th Cir. 2011) ("Assertions of past danger will not satisfy the 'imminent danger' exception."); *cf.* [*Pointer v. Wilkinson*, 502 F.3d 369, 371 n.1 (6th Cir. 2007)] (implying that past danger is insufficient for the imminent-danger exception).
>
> In addition to a temporal requirement, we have explained that the allegations must be sufficient to allow a court to draw reasonable inferences that the danger exists. To that end, "district courts may deny a prisoner leave to proceed pursuant to § 1915(g) when the prisoner's claims of imminent danger are conclusory or ridiculous, or are clearly baseless (i.e. are fantastic or delusional and rise to the level of irrational or wholly incredible)." *Rittner*, 290 F. App'x at 798 (internal quotation marks and citations omitted); *see also Taylor*, 508 F. App'x at 492 ("Allegations that are conclusory, ridiculous, or clearly baseless are also insufficient for purposes of the imminent-danger exception.").

*Vandiver v. Prison Health Services, Inc.*, 727 F.3d 580, 585 (6th Cir. 2013).  A prisoner's claim of imminent danger is subject to the same notice pleading requirement as that which applies to prisoner complaints.  *Id.*  Consequently, a prisoner must allege facts in the complaint from which the Court could reasonably conclude that the prisoner was under an existing danger at the time he filed his complaint, but the prisoner need not affirmatively prove those allegations.  *Id.*

---

unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three-strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998) (declining to allow "litigious prisoners to immunize frivolous lawsuits from the 'three strikes' barrier by the simple expedient of pleading unexhausted habeas claims as components of § 1983 suits"); *Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it "would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a strike under the three-strikes rule).

All of Plaintiff's allegations concern past dangers.  With respect to Plaintiff's allegations other than those involving the COVID-19 protocols, none even arguably suggests that Plaintiff faces imminent danger of serious physical injury at any time, either in the past or in the future.

With respect to Plaintiff's allegations about his ongoing risk of contracting COVID-19 due to individual officers' failures to strictly follow protocol, Plaintiff's allegations are insufficient to suggest that he was in imminent danger at the time he filed his complaint.  Most of the allegations involve conduct long preceding the filing of Plaintiff's lawsuit.  In addition, Plaintiff acknowledges that he contracted COVID-19 on December 28, 2020, two months before he filed his complaint.

In a case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection.  *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020).  In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42.  The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts.  The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death.  Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.
>
> The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include
>
>> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.
>
> *Id.* at 42–43.
>
> The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.
>
> Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant

supplies, and providing masks.  The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing.  The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In the *Wilson* decision, the Sixth Circuit cited other Sixth Circuit decisions that found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable.  *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)).  The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims.  958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)].  The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously."  *Id.* at 1088–90 (citation omitted).  In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86.  The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference.  *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)].  In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against

the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court concluded that, even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at

394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

In the instant case, Plaintiff expressly acknowledges that the MDOC established extensive policies and protocols designed to minimize the risk of exposure and contagion within Michigan prison facilities. Indeed, he relies on those policies, and his allegations largely focus on alleged minor violations of them. The MDOC protocols regarding sanitation, personal protective equipment, social distancing, testing, isolation of exposed prisoners, quarantine and care of infected prisoners, transfers, employee conduct, and, more recently, vaccinations are published and updated regularly at MDOC Response and Information on coronavirus (COVID-19), https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337 (last visited July 8, 2021).[4] In addition, the MDOC issued its first COVID-19 Director's Office Memorandum (DOM) on April 8, 2020, and issued multiple revised DOMs on the subject over the next 14 months. *See* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining

---

[4] Although the page is hosted on Medium.com, the MDOC specifically links to this page from their website as the location where they will provide updates and information. *See* https://www.michigan.gov/corrections/0,4551,7-119-9741_12798-521973--,00.html (last visited July 8, 2021). The Court takes judicial notice of these facts under Rule 201 of the Federal Rules of Evidence. The accuracy of the source regarding this specific information "cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 49 (3d ed. 2019) (citing *Matthews v. NFL Mgmt. Council*, 688 F.3d 1107 (9th Cir. 2012) (taking judicial notice of statistics on the NFL website that the plaintiff played 13 games in California over 19 years); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236–37 (3d. Cir. 2007), as amended (Nov. 20, 2007) (finding error where a district court took judicial notice of facts stated in "a party's . . . marketing material" on an "unauthenticated" website because marketing materials often lack precise and candid information and the source was not authenticated)). Moreover, "[t]he court may take judicial notice at *any* stage of the proceeding." Fed. R. Evid. 201(d) (emphasis added). Thus, the Court may take judicial notice even at this early juncture because the Court is permitted to take judicial notice *sua sponte*, Fed. R. Evid. 201(c)(1), and "the fact is not subject to reasonable dispute," Fed. R. Evid. 201(b).

specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer); MDOC DOM 2020-30R3 (eff. May 27, 2020); MDOC DOM 2020-30R4 (eff. Aug. 10, 2020); MDOC DOM 2020-30R5 (eff. Aug. 25, 2020); MDOC DOM 2020-30R6 (eff. Aug. 27, 2020); MDOC DOM 2020-30R7 (eff. Nov. 5, 2020); MDOC DOM 2020-30R8 (eff. Nov. 24, 2020); MDOC DOM 2021-26 (eff. Jan. 1, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R2 (eff. Jan. 21, 2021); MDOC DOM 2021-26R3 (eff. Jan. 25, 2021); MDOC DOM 2021-26R4 (eff. Mar. 5, 2021); DOM 2021-26R5 (eff. Mar. 19, 2021); DOM 2021-26R6 (eff. Mar. 26, 2021); DOM 2021-26R7 (eff. June 23, 2021). The DOMs set forth specific details about protective measures to be taken in all facilities: describing the types of PPE to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies, setting protocols for COVID-19 testing of prisoners; and making other necessary adjustments to practices to manage the pandemic. Viewing these significant precautions and protocols together, it is apparent that the MDOC has recognized the need to adjust practices to protect inmates and has reasonably implemented practices to do so.

Moreover, as indicated in the quoted information from the MDOC's Medium site, staff members began receiving vaccinations in December 2020, and prisoners began receiving vaccinations under the same criteria as free citizens in January 2021, beginning with those 65 and older in January and gradually opening vaccinations to all by April 5, 2021. *See* https://medium.

com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f431

44337 (last visited July 8, 2021) (referencing Michigan COVID-19 Vaccination Interim

Prioritization Guidance, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=

&ved=2ahUKEwietpDhpNTxAhXQKFkFHTQFDM0QFnoECAMQAw&url=https%3A%2F%2

Fwww.michigan.gov%2Fdocuments%2Fcoronavirus%2FMI_COVID-19_Vaccination_

Prioritization_Guidance_2152021_716344_7.pdf&usg=AOvVaw2C3C42ZNe30gdpon8oF91C)

(last visited July 8, 2021)).  As a man of 60 years who states that his medical issues require that he

use an inhaler, Plaintiff himself became eligible for vaccination on March 8, 2021, one week after

his complaint was filed in this Court.  *Id.* (noting that on "Monday, March 8, facilities will begin

offering the vaccine to prisoners who are aged 50 and older with an underlying health condition.").

And four weeks later, on April 5, 2021, all prisoners became eligible for vaccination.  *Id.*  In

addition, as of July 2, 2021, all prisoners at all MDOC facilities have either been vaccinated or

refused vaccination.  *See* Michigan COVID-19 Vaccine Dashboard, https://www.michigan.

gov/coronavirus/0,9753,7-406-98178_103214-547150--,00.html (visited July 8, 2021).

   Since Plaintiff's own COVID-19 infection preceded the filing of the complaint by

three months, the failures to adhere to policy that preceded—or even closely followed—that

infection are past conduct that did not place Plaintiff in imminent danger at the time he filed his

complaint.  *Vandiver*, 727 F.3d at 585 (citing *Rittner*, 290 F. App'x at 797–98).  Moreover, since

that time, specific lapses in protocol remain past conduct and are relevant only to whether a

sufficient pattern of conduct might continue after filing that could place Plaintiff in imminent

danger of serious physical injury.

   Plaintiff's allegations concerning his exposure to ongoing risk between January 1,

2021, and February 26, 2021, the date Plaintiff filed his complaint, are limited and largely concern

his general objection to "cross-contamination"—a standing objection to any Defendant who works in a different unit coming to A-Unit without decontaminating their clothing.  He asserts that Defendants Newcomb, Stain, Batho, Laponsie, and Dykes, as well as non-defendant officers LaCross, Lyon, and Abiz, engaged in this practice, which allegedly exposed Plaintiff to imminent risk of serious physical injury.  Plaintiff also complains that, on certain occasions, Defendant supervisory officials failed to eliminate the practice.  During the same period, supervisory Defendants sometimes permitted too many prisoners to go to the showers and the chow hall at the same time, preventing adequate social distancing.  In addition, Plaintiff alleges that Defendants Stain, Laponsie, Dykes, and Newcomb failed to protect him from second-hand tobacco smoke and illegal drugs that corrupt staff smuggled into the prison and that the supervisory Defendants failed to crack down on the smuggling.  Finally, he alleges that Defendant unknown dentist and dental hygienist failed to provide timely routine care, and, when they did clean his teeth on February 26, 2021, they caused injury to the lower left quadrant of his mouth.

Plaintiff's allegations concerning the alleged cross-contamination caused by officials' failures to change clothing between units fall well short of demonstrating imminent danger.  Plaintiff's expectation that prison officials must change their clothing or otherwise decontaminate that clothing every time they move between units falls well outside Defendants' obligation to reasonably respond to the risk of spreading COVID-19.  *Wilson*, 961 F.3d at 840–41. As a result, Plaintiff's allegations about cross-contamination in January and February provide no basis for concluding that Plaintiff was in imminent danger of serious physical injury from the virus at the time he filed his complaint.

Moreover, Plaintiff's general complaints that Defendants occasionally allowed inadequate social distancing in the past fall well short of demonstrating that he faced imminent

danger when he filed his complaint, especially given the generality of the allegations.  Given the many precautionary measures undertaken by the MDOC, occasional lapses demonstrate nothing more than negligence, not deliberate indifference.  *Id.* at 841–42.

Plaintiff's allegations concerning second-hand smoke are vague and conclusory. He claims that corrupt officials allow cigarettes and drugs to be smuggled into the facility and that officials sometimes smoke cigarettes in the bathroom, thereby exposing him to second-hand smoke For many years, MDOC policy has prohibited all smoking by prisoners and smoking by employees and members of the public in prison areas where smoking is prohibited, including housing units. Mich. Dep's of Corr. Policy Directive (PD) 01.03.140(H) (eff. Mar. 4, 2011).  Plaintiff does not allege that anyone is smoking in his unit, and he makes no factual allegations concerning the amount of smoke.  He simply declares that the presence of any second-hand smoke places him in imminent danger of serious physical injury.  Plaintiff's conclusory allegations are simply insufficient "to allow a court to draw reasonable inferences that the danger exists." *Vandiver*, 727 F.3d at 585.

Finally, Plaintiff's allegations concerning the delay preceding his February 2021 routine dental care falls well short of the imminent-danger requirement.  Although delaying routine dental cleanings may present some risk to an individual if it goes on too long, nothing about a delay of a few months, standing alone, suggests that any risk is imminent.  *Id*.  Further, any injury caused during the February tooth-cleaning again demonstrates only past conduct, which does not fall within the imminent-danger exception to the three-strikes rule.  *Id.*

In sum, notwithstanding Plaintiff's repeated references to the many "imminent dangers" to which Defendants have exposed him over the course of a year, Plaintiff's omnibus complaint fails to demonstrate that he was in imminent danger of serious physical injury at the

14

time he filed his complaint. Therefore, § 1915(g) prohibits Plaintiff from proceeding *in forma pauperis* in this action.  Plaintiff has twenty-eight (28) days from the date of entry of this order to pay the civil action filing fees, which total $402.00.  When Plaintiff pays his filing fees, the Court will screen his complaint as required by 28 U.S.C. § 1915A and 42 U.S.C. § 1997e(c).  If Plaintiff does not pay the filing fees within the 28-day period, this case will be dismissed without prejudice, but Plaintiff will continue to be responsible for payment of the $402.00 filing fees.


Dated:      July 19, 2021                            /s/ Robert J. Jonker
                                                     Robert J. Jonker
                                                     Chief United States District Judge


**SEND REMITTANCES TO THE FOLLOWING ADDRESS**:

Clerk, U.S. District Court
330 Federal Bldg.
202 W. Washington St.
PO Box 698
Marquette, MI 49855

**All checks or other forms of payment shall be payable to "Clerk, U.S. District Court."**